# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* J. A. M. COLLIER, Minor.

FOR PUBLICATION
March 15, 2016
9:00 a.m.

No. 328172
St. Clair Circuit Court
Family Division
LC No. 13-000164-NA

Before: TALBOT, C.J., and WILDER and BECKERING, JJ.

PER CURIAM.

Respondent appeals as of right the trial court's order terminating his parental rights to his daughter, JC. The trial court determined that a statutory basis for termination existed under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), MCL 712A.19b(3)(g) (failure to provide proper care and custody), and MCL 712A.19b(3)(j) (reasonable likelihood of harm). Because we find that respondent was effectively deprived of an adjudication hearing, we vacate and remand.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

JC is the child of respondent and KR. At the time the proceedings in this case began, KR and respondent shared joint physical and legal custody of JC. On June 21, 2013, JC was removed from KR's care and placed in the custody of respondent. JC was removed from KR's care due in large part to KR's significant substance abuse, including the use of methamphetamine, cocaine, and marijuana, as well as her involvement in manufacturing methamphetamine. She had also failed to provide proper supervision of JC. The trial court ordered that as a condition of respondent caring for JC, the "mother shall not have any contact with [JC] outside of visitation arranged by [petitioner] or any other contact permitted by [petitioner]." Following a preliminary hearing, a petition filed by DHHS was authorized; KR pled no contest to the petition and the trial court entered an order of adjudication with regard to KR.

On March 13, 2014, JC was removed from respondent's care. Petitioner filed a supplemental petition alleging that despite respondent's being aware of KR's intractable drug problem, he nevertheless continued to allow KR unauthorized and unsupervised contact with JC on multiple occasions. At an April 10, 2014 pretrial hearing, Lesley Clark, KR's attorney, indicated that she would be representing respondent at the adjudication hearing, and that

-1-

respondent was seeking a bench trial. On April 14, 2014, the court entered an order appointing Clark to serve as respondent's attorney.

On May 14, 2014, the date scheduled for the adjudication bench trial, respondent did not appear. Clark stated on the record that since the last hearing, she had given respondent her telephone number and address and asked him to call her and make an appointment to come and see her. She stated that to her knowledge, he had not done so, and thus, she did not feel she could adequately represent him. She moved to be "dismissed from the case," and the hearing referee "thank[ed] and excuse[d]" Clark from representing respondent. Clark did not participate in the remainder of the hearing.

Immediately after excusing Clark, the referee announced that "[t]he Court will enter a default." Without elaborating on what that meant, the referee indicated that counsel for petitioner could proceed. What followed was testimony from two witnesses, spanning seven pages of transcript. The first witness, Samantha Dixon, testified that she was employed at JC's day care facility, and thus, she knew JC. Dixon testified that she had seen JC with a woman she "assumed" was her mother, KR.[1] Respondent, whom Dixon also knew, was not with JC and the woman. Dixon described the woman with JC as "skinny" with "dark hair, glasses" and her hair pulled back. The second witness, Child Protective Services worker Andrea Smallenberg, testified that the description Dixon gave was consistent with KR's appearance. Smallenberg also testified that she had spoken to an employee at KR's doctor's office, who indicated that KR had been in the office on March 1, 2014 with a child she believed was JC. Smallenberg testified that after being shown a picture of JC, the employee verified that it was JC she had seen with KR.

Following the testimony, the referee stated on the record that, "[b]ased on the evidence presented the Court finds" that "there is a preponderance of the evidence to establish a temporary Wardship pursuant to the statutory grounds in the petition." The referee indicated it would enter an order to that effect. A subsequent written order noted that the referee "entered a default against [respondent] for failure to appear and proceeded in a default manner." The order concluded that "for the reasons stated on the record, or in a written opinion, the Court finds that the minor children [sic] shall remain under the jurisdiction of the Court."

Although respondent failed to attend the adjudication trial, the record reveals that he attended subsequent hearings during the dispositional phase, including a permanency planning hearing five days later on May 19, 2014. Respondent did not have counsel present at the May 19, 2014 hearing. Nor does it appear from our review of the record that he had counsel for quite some time. According to the record provided to us, it appears at least from dispositional orders, that respondent was without counsel for approximately a year.[2]

Indeed, the record next contains an order appointing counsel for respondent on April 9, 2015 for a show-cause hearing that took place on April 13, 2015. The purpose of that hearing

---

[1] Dixon testified she assumed it was KR, adding "I've seen her [KR] once or twice."

[2] We have not been provided with transcripts from various dispositional review hearings.

was for respondent to show cause as to why he should not be held in contempt for violating a no-contact order with KR.[3] At the show-cause hearing, foster-care worker Samantha Mullens testified that it appeared there had been contact between respondent and KR after KR's parental rights had been terminated. Mullens's testimony was based on certain text messages between respondent and KR. Mullens testified that one message sent from KR to respondent stated, "Will you let me call [JC] when you get her? I would love to talk to her on the phone so I can tell her I'm going to get her some new shoes and stuff today. lol." Respondent replied, "I do not have a phone . . . . I will see if I can take her to my mom's house again." "Immediately after that," Mullens testified, "I received a text message from [respondent] stating, am I allowed to take my daughter to my mom's house[?]" Respondent pled guilty to violating the trial court's no contact order and admitted he had violated the order, explaining that his contact with KR was in part due to a "soft part" he had in his heart for her, and that when he looks at his daughter, he sees KR in her. He avowed, however, that such contact would not happen again. "I messed up," "made a big mistake," respondent stated. But he assured the court that he had "learned from it."[4]

Three weeks later, petitioner filed a supplemental petition requesting termination of respondent's parental rights in light of the information that came out at the show cause hearing. On May 18, 2015, the court appointed counsel for respondent for the impending termination hearing.

At the June 10, 2015 termination hearing, social worker Jessica Leenanegt testified that she worked with respondent through the Family Together Building Solutions (FTBS) Program from October 2014 until February 2015. She testified that respondent was successful in obtaining suitable housing, and he already had employment by the time she became involved with him at FTBS. Leenanegt observed respondent's visits with JC; she testified that he and JC had a positive relationship, a loving bond, and for the most part, he demonstrated good parenting skills. At the beginning of her service, respondent and KR were doing their supervised parenting visits together, but once the petition was filed to terminate KR's parental rights, respondent took over visits by himself and that is when he was advised not to have contact with KR. Leenanegt worked with respondent on understanding the difference between healthy and unhealthy relationships, and they talked about how a relationship with KR would be unhealthy because her substance abuse could be dangerous to JC. Respondent assured her that he was not having contact with KR. Although Leenanegt believed she had successfully closed respondent's case in

---

[3] KR voluntarily agreed to relinquish her parental rights on February 4, 2015. It appears that the court imposed a no-contact order between respondent and KR in February 2015, after KR voluntarily relinquished her parental rights. On February 19, 2015, the trial court issued a restraining order. In the order, the trial court noted that KR's parental rights had been terminated and she had been ordered to have no contact with respondent, with whom JC was placed. The trial court found that despite this prohibition against contact between KR and respondent, "contact with mother has been occurring and is detrimental to said minor."

[4] The trial court indicated that it was going to order respondent to serve ten days in the county jail, but he would hold that order in abeyance, subject to respondent performing 20 hours of community service.

-3-

February, she agreed that if he had in fact been having contact with KR, she would say he was not successful in the program with regard to the healthy relationship aspect of his services.

Mullens testified regarding her observations of respondent over the prior year. She noted that he had successfully obtained suitable housing and he had a legal source of income. According to plan, he had been having supervised parenting visits together with KR until a petition was filed in December of 2014 seeking termination of KR's parental rights. At that time, KR's visits ceased. Respondent's visits with JC were changed to unsupervised as of January 2015 "due to the progress that he was making." Mullins testified that respondent engaged well with JC and they had "a really great bond." However, Mullens discovered that respondent and KR had been in contact between February and "mid-March," after KR's parental rights had been terminated. Mullens testified that KR had provided her with text messages documenting this contact. There were allusions to drug use by respondent and KR in the messages. Mullens testified that at one point respondent had had so many negative drug screens that petitioner stopped requiring the tests. But after the text messages implied that he was using, he was tested again and had two positive tests and two missed tests. Mullens summed it up by saying that respondent had been doing "very well," and he was "one hundred percent compliant," but "then in the last month or two it really went downhill."

Respondent acknowledged that he had used marijuana and stated he "had a miss-relapse," but denied that he has a marijuana problem. Consistent with his testimony at the show cause hearing, respondent admitted that he had had contact with KR, and when asked why he stated, "Stupidity, wasn't thinking." Respondent explained he had "messed up," "made a couple of mistakes," "slipped up," "fumbled," but vowed that "it won't happen again."

The trial court found that statutory grounds for termination existed under MCL 712A.19b(3)(c)(*i*), § 19b(3)(g), and § 19b(3)(j) stemming from respondent's contact with KR—including their using marijuana together—despite his alleging that he was not in contact with her, its judicial notice of the show cause hearing, and evidence that respondent arranged in February 2015 for KR to have contact by phone with JC pursuant to KR's request. The trial court stated that it was aware JC was in a relative placement, but it still believed termination of respondent's parental rights was in the child's best interests because she was three years old and in need of permanence.

II. ANALYSIS

Respondent challenges the adjudicative phase of the proceedings on multiple grounds, as well as whether the trial court clearly erred when it found statutory grounds for termination and that termination was in the best interests of the child. We first consider his contention that the referee violated his right to due process by proceeding in a default manner against him with regard to adjudication. "Whether child protective proceedings complied with a parent's right to procedural due process presents a question of constitutional law, which we review de novo." *In re Sanders*, 495 Mich 394, 403-404; 852 NW2d 524 (2014).

-4-

## A. ADJUDICATION

"In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase." *Id*. at 404. Generally, during the first phase, a court determines whether it can take jurisdiction over the child in the first place. *Id*. "Once the court has jurisdiction, it determines during the dispositional phase what course of action will ensure the child's safety and well-being." *Id*.

Petitioner may initiate child protective proceedings by filing a petition "containing facts that constitute an offense against the child under the juvenile code." *Id*. at 405, citing MCR 3.961. The parent may demand an adjudication trial at which he has a right to a jury trial and at which the rules of evidence "generally apply," or he may admit to the allegations contained in the petition. *Id*. The "petitioner has the burden of proving by a preponderance of the evidence one or more statutory grounds for jurisdiction alleged in the petition, MCR 3.972(E)." *Id*. "When the petition contains allegations of abuse or neglect against a parent . . . and those allegations are proved by a plea or at the trial, the adjudicated parent is unfit." *Id*. "While the adjudicative phase is only the first step in child protective proceedings, it is of critical importance because [t]he procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights." *Id*. at 406 (citation and quotation marks omitted).

In *Sanders*, our Supreme Court considered the constitutionality of the one-parent doctrine; this doctrine is not at issue here, but a brief discussion of the doctrine is merited. The one-parent doctrine permitted a trial court to exercise jurisdiction based on an adjudication of only one parent, and "allow[ed] the court to then enter dispositional orders affecting the parental rights of *both* parents." *Id*. at 407. The Court struck down the one-parent doctrine, noting that parents have a fundamental right "to make decisions concerning the care, custody, and control of their children." *Id*. at 409. The Court emphasized that this right "cannot be overstated." *Id*. at 415. Because this right is fundamental and protected by the Due Process Clause of the Fourteenth Amendment, it "cannot be infringed without *some* type of fitness hearing." *Id*. Therefore, the Court concluded that "due process requires that every parent receive an adjudication hearing before the state can interfere with his or her parental rights." *Id*. The adjudication required by due process is "a specific adjudication of a parent's unfitness before the state can infringe the constitutionally protected parent-child relationship." *Id*. at 422. Pertinent to that case, the Court rejected the one-parent doctrine as a violation of due process because it "allows the court to deprive a parent of this fundamental right without any finding that he or she is unfit[.]" *Id*.

## B. RESPONDENT WAS EFFECTIVELY DENIED AN ADJUDICATION TRIAL

Although the one-parent doctrine is not at issue in this case, we find that respondent was effectively denied the adjudication trial to which he was entitled. The hearing referee who conducted the adjudication trial stated that it was "enter[ing] a default" against respondent because he failed to appear for the trial. We are aware of no authority for the proposition that a respondent in child protective proceedings can be defaulted. In fact, the court rules are clear that a default cannot be entered in child protective proceedings. MCR 3.901(A)(1) sets forth the court rules that are applicable to child protective proceedings; the rule pertaining to defaults, MCR 2.603 *et seq.*, is not among the rules specifically incorporated in juvenile or child

protective proceedings. Moreover, MCR 3.901(A)(2) declares that "[o]ther Michigan Court Rules apply to juvenile cases in the family division of the circuit court *only when this subchapter specifically provides*." (Emphasis added). Thus, respondent should not have been defaulted for failing to appear. Furthermore, as recognized in *Sanders*, 495 Mich 422, due process requires an adjudication trial on a parent's fitness "before the state can infringe the constitutionally protected parent-child relationship." It is axiomatic that a default is not an adjudication trial as to respondent's fitness as a parent, nor have we encountered any authority that a default can serve as a substitute for such a trial. Although an adjudication trial "is only the first step in child protective proceedings," it is nevertheless of "critical importance" because "[t]he procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights." *Sanders*, 495 Mich at 406 (citation and quotation marks omitted). As such, the hearing referee denied respondent his right to due process by entering a default against him for his failure to appear at the adjudication trial and by infringing on his fundamental right to make decisions regarding the care and custody of his minor child.[5]

Petitioner argues that respondent, despite having a default entered against him, nevertheless received an adjudication trial. Examining the record and the manner in which the alleged adjudication trial proceeded, we do not agree.[6] To begin with, we note that respondent's counsel was excused from the adjudication "trial" before it started, and that counsel did not advocate on respondent's behalf during the proceeding. And, respondent was not present. Thus, respondent had no representation whatsoever during the adjudication trial, and petitioner was simply left to put on evidence, unopposed.[7] Plowing forward with an adjudication trial in the absence of both respondent and an attorney who can represent respondent offends due process by any stretch of the imagination.[8] See *Bye v Ferguson*, 138 Mich App 196, 205; 360 NW2d 175 (1984). Indeed, "[d]espite [respondent's] apparent lack of interest in participating in his own

---

[5] Our decision by no means indicates that a respondent can choose not to show up for an adjudication proceeding and somehow stymie the adjudication process. Practitioners in the field of child protective proceedings know well that some parents do not always show up for hearings. In those instances, assuming proper notice was given, the parent's interests are protected by counsel. This case is unique because the referee chose to dismiss respondent's counsel at the outset of the proceedings, with no indication that respondent had any intention of proceeding without counsel or otherwise foregoing his due process rights.

[6] Despite the fact that a cursory proceeding occurred after the hearing referee stated that it was entering a default, the subsequent order exercising jurisdiction over the child as to respondent stated that it was entered "for the reasons stated on the record, or in a written opinion[.]" Thus, it is unclear why the court exercised jurisdiction, and it is not apparent that the court even relied on the cursory proceeding that followed the default.

[7] We note that the guardian ad litem for JC was present to represent JC's interests.

[8] Again, we do not attempt to excuse respondent's failure to appear for the adjudication trial; however, we note our concern that respondent was effectively railroaded when the adjudication trial—to the extent it was even conducted given the referee's remarks about a default—was conducted without any semblance of representation for respondent.

defense, he was entitled to assume that he would be represented at trial." *Pascoe v Sova*, 209 Mich App 297, 301; 530 NW2d 781 (1995). That is, having had counsel appointed for him in April 2014, respondent was entitled to assume that counsel would represent him at the adjudication trial, notwithstanding his unexcused absence at the trial. While similar issues resulted in error requiring reversal in civil cases such as *Bye* and *Pascoe*, we find the problem even more egregious in the instant case, a child protective proceeding. It is well established that "[p]arents have a significant interest in the companionship, care, custody, and management of their children, and the interest is an element of liberty protected by due process." *Sanders*, 495 Mich at 409 (citation and quotation marks omitted). Thus, even assuming that respondent was not simply defaulted and that an adjudication "trial" occurred, we find a violation of due process given that petitioner was permitted to proceed unopposed at adjudication, thereby effectively depriving respondent of an adjudication trial.

On a related note, respondent was deprived of the assistance of counsel during the adjudication proceeding. See MCR 3.915(B)(1) (explaining that a respondent has the right to counsel, including appointed counsel, at the respondent's first court appearance and "at any hearing" conducted thereafter); *In re Williams,* 286 Mich App 253, 275; 779 NW2d 286 (2009) (recognizing that a respondent in a child protective proceeding has the right to counsel, including appointed counsel). In April 2014, respondent requested counsel, and there is no indication that he waived his right to counsel before the May 14, 2014 adjudication trial.[9] Nor is there any indication that he terminated the attorney-client relationship, based on what was characterized as a one-month-long failure to communicate with counsel. In *In re Hall*, 188 Mich app 217, 222; 469 NW2d 56 (1991), this Court held the respondent "effectively terminated the attorney-client relationship, thereby 'waiving' or relinquishing her right to counsel" by failing to contact her appointed counsel for 16 months. Here, although respondent's counsel indicated that she was not in contact with him for approximately one month, we do not find that respondent's conduct was such that he effectively terminated the attorney-client relationship or otherwise waived his right to be represented by counsel. Rather, respondent's lack of communication with counsel spans only one month, and it came on the heels of respondent's specific request for counsel.

In addition to the fact that the adjudication trial was essentially an ex parte proceeding, we note that the brief "trial" that occurred lacked some of the hallmarks of a typical adjudication trial. Notably, petitioner was allowed to present inadmissible hearsay evidence from Smallenberg, who testified that JC was with KR based on an out-of-court conversation she had with an employee at KR's doctor's office. See MRE 802. Unlike at the dispositional phase of protective proceedings, the rules of evidence apply to adjudication trials. MCR 3.972(C); *Sanders*, 495 Mich at 405. Thus, Smallenberg's testimony should not have been admitted against respondent. Moreover, the only other testimony about whether JC was with KR was speculative testimony from Dixon who testified that she "assumed" the woman with JC was KR. The presentation of this evidence spanned only seven pages of trial transcript. The flimsy nature of the evidence and the proceeding was a manifestation of the larger problems in this case: the

---

[9] We are also troubled by the fact that it appears, from the record before us, that respondent did not have counsel for nearly the entirety of the dispositional phase of the proceedings.

trial was a perfunctory default proceeding, respondent had no representation, and petitioner was allowed to present its case against him unopposed.

In light of the forgoing issues, we hold that respondent was effectively denied an adjudication in this matter. In *Sanders*, 495 Mich at 422, our Supreme Court held that "due process requires a specific adjudication of a parent's unfitness before the state can infringe the constitutionally protected parent-child relationship." Given all that occurred in this case, we simply cannot conclude that respondent was afforded a "specific adjudication" regarding his fitness or lack thereof. Accordingly, we hold that respondent was denied his right to due process. *Id*.

## C. RESPONDENT'S CHALLENGE IS NOT AN IMPERMISSIBLE COLLATERAL ATTACK

Petitioner argues that, despite any deficiencies in the adjudication trial, we should deny respondent's challenge because it is an impermissible collateral attack on the court's exercise of jurisdiction. We disagree.

When, as occurred in this case, a termination of parental rights occurs following the filing of a supplemental petition for termination after the issuance of the initial dispositional order, any attack on the adjudication is an impermissible collateral attack. *In re SLH*, 277 Mich App 662, 668; 747 NW2d 547 (2008) ("Ordinarily, an adjudication cannot be collaterally attacked following an order terminating parental rights."). See also *In re Hatcher*, 443 Mich 426, 437-438; 505 NW2d 834 (1993). Instead, "[m]atters affecting the court's exercise of its jurisdiction may be challenged only on direct appeal of the jurisdictional decision[.]" *In re Kanjia*, 308 Mich App 660, 667; 866 NW2d 862 (2014). Here, respondent failed to file a direct appeal of the trial court's adjudication order and instead waited to raise any issue with regard to the adjudication until after the order was entered terminating his parental rights. Thus, were we to apply the rule from *Hatcher* and *SLH*, we would find that respondent's challenge to the adjudication was an impermissible collateral attack because his appeal was not filed until after his parental rights were terminated.

However, we decline to find that the collateral-attack rule bars respondent's challenge in the instant case. In so holding, we are guided by this Court's decision in *Kanjia*, 308 Mich App 660. Like *Sanders*, *Kanjia* was a case involving the application of the one-parent doctrine. *Id*. at 666. Recognizing that an adjudication cannot ordinarily be collaterally attacked following an order terminating parental rights, the panel in *Kanjia* addressed the issue of whether the respondent "may now raise the issue for the first time on direct appeal from the order of termination[.]" *Id*. at 667. This Court held that "a *Sanders* challenge, raised for the first time on direct appeal from an order of termination, does not constitute a collateral attack on jurisdiction, but rather a direct attack on the trial court's exercise of its dispositional authority." *Id*. at 669. In so holding, this Court recognized that *Sanders* "held that due process protections prevent a trial court from entering dispositional orders—including orders of termination—against an *unadjudicated* respondent." *Id*. at 669-670 (emphasis added). Thus, an unadjudicated respondent raising a challenge to the lack of an adjudication

on direct appeal from a trial court's order of termination is not collaterally attacking the trial court's exercise of jurisdiction, but rather is directly challenging the trial court's decision to terminate the respondent's parental rights without first having afforded the respondent sufficient due process, i.e., an adjudication hearing at which the respondent's fitness as a parent was decided. [*Id.* at 670.]

Although the instant case did not involve the application of the one-parent doctrine, we nevertheless conclude that the same problem present in *Kanjia* exists in this case: respondent effectively never received an adjudication as to his fitness as a parent. This is also the same due process issue identified in *Sanders*. See *Sanders*, 495 Mich at 422 ("We accordingly hold that due process requires a specific adjudication of a parent's unfitness before the state can infringe the constitutionally protected parent-child relationship."). Consequently, just as in *Kanjia*, 308 Mich App at 670, we conclude that respondent "is not collaterally attacking the trial court's exercise of jurisdiction, but rather is directly challenging the trial court's decision to terminate the respondent's parental rights without first having afforded the respondent sufficient due process, i.e., an adjudication hearing at which the respondent's fitness as a parent was decided."[10] Therefore, "we hold that respondent is entitled to raise his [ ] challenge on direct appeal from the trial court's order of termination, notwithstanding the fact that he never appealed the initial order of adjudication." *Id.* at 671.

## III. CONCLUSION

Because respondent was effectively unadjudicated, we vacate the order terminating his parental rights and the order of adjudication, and remand for further proceedings consistent with this opinion.[11] We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Kurtis T. Wilder
/s/ Jane M. Beckering

---

[10] Furthermore, we note the problem that exists in this case with requiring respondent to file a direct appeal from the order of adjudication. As noted above, respondent was deprived of his right to counsel and the adjudication proceeded with no representation for respondent whatsoever. To expect respondent to appeal an order entered after a proceeding at which his counsel withdrew, without his knowledge, and at which he was not present, would be to impose a heavy burden on respondent. For this reason, we are also uncomfortable with petitioner's characterization of this issue being unpreserved. We question how respondent could reasonably be expected to have raised the issues about which he complains on appeal when there was no one present at the adjudication trial to represent his interests. And it appears he did not receive appointed counsel again until nearly a year later.

[11] Because we vacate the order terminating respondent's parental rights, we need not address respondent's remaining arguments.