*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* X. SORRELLS, Minor.

UNPUBLISHED
May 7, 2019

No. 344129
Ingham Circuit Court
Family Division
LC No. 16-001563-NA

Before: CAMERON, P.J., and BECKERING and RONAYNE KRAUSE, JJ.

RONAYNE KRAUSE, J. *(dissenting)*

I respectfully dissent. Under the circumstances, I do not agree that respondent's due process rights were violated. Furthermore, even if some violation of respondent's rights had occurred, I would find any such violation to have been harmless under the circumstances of this case. I would affirm.

## I. BACKGROUND

As the majority explains, the instant proceedings began on the day the child, XS, was born, due to the mother's drug use and untreated mental health problems. At the time the petition was filed, respondent was only the alleged father of XS, and there had not yet been an attempt to contact him. Petitioner asserted that the request for termination at the initial deposition should be granted for the health and well-being of XS and XS's half-sister.[1] The trial court authorized the petition upon finding that probable cause existed. At the hearing, the trial court ordered that "the absent parent protocol be followed as to [respondent]."

At a hearing on December 8, 2016, petitioner and a representative for the children requested that the court order the jail to perform a DNA test for respondent. On January 30,

---

[1] XS's half-sister is not at issue in the instant appeal.

2017, respondent appeared at a hearing on a *Sanders*[2] petition regarding the father of XS's half-sister. The trial court explained that because respondent was, at the time, only the alleged father of XS, he would need to first establish himself as her father before he would be entitled to an attorney. Respondent was advised that if the DNA results showed that he was XS's biological father, there would be a new or amended petition filed, and he would have a right to an attorney at that time. The trial court determined that a statutory basis existed for the Family Division of the circuit court to take jurisdiction over the children, but it explained to the mother that the termination was a two-step process: the first step being an adjudication followed by a disposition.

Respondent's DNA test was scheduled for February 7, 2017, and the results confirmed that respondent was XS's biological father. At a dispositional hearing on February 22, 2017, which was not attended by either respondent or the father of XS's half-sister, the trial court was informed of respondent's DNA test results. The trial court entered an order following that hearing finding probable cause to believe that respondent was XS's legal father. The same order also included, in part, the following other requirements: (1) notify the court of any change of address or telephone number, (2) keep all appointments with the foster care worker, (3) "cooperate with the Foster Care Worker in complying with all Court orders," (4) immediately notify the foster care worker if arrested, (5) obtain lawful employment and maintain lawful financial support for XS, (6) refrain from using alcohol or drugs, (7) obtain a substance abuse assessment and follow its recommendations, (8) submit to random alcohol and drug testing, (9) attend counselling sessions and psychological evaluations as directed by the foster care worker, (11) maintain a home suitable for a child, and (12) refrain from using physical discipline with XS.[3]

On May 9, 2017, respondent appeared personally at a hearing. The trial court was advised that respondent had a parenting visit scheduled for later that day. Respondent admitted that he had been provided with the DNA test results but had not actually looked at them. However, he stated that if the results showed him to be the biological father of XS, he did wish to make himself the legal father. The trial court ordered respondent to execute an affidavit of paternity within 14 days,[4] and it advised him that once he was established as a legal father, he would be entitled to be represented by an attorney upon his request. As the majority describes, the trial court advised respondent that if he established legal paternity, appeared in court, and asked for an attorney, the court would appoint an attorney for him. Respondent acknowledged and stated that he would return. Following the hearing, the trial court entered an order that, in

---

[2] A "*Sanders* petition" or a "*Sanders* hearing" generally refers to the requirement that each parent must be afforded his or her own separate adjudication. See *In re Sanders*, 495 Mich 394, 413-420; 852 NW2d 254 (2014).

[3] This order was consistent with recommendations from the foster care agency.

[4] The affidavit could not be executed that day because at the time, the mother's whereabouts were unknown, so the process might need to involve the Prosecutor's Office.

relevant part, provided that respondent had 14 days to establish paternity and that all prior orders remained in effect. Respondent subsequently executed the affidavit of parentage.

Petitioner filed a *Sanders* petition against respondent on July 14, 2017, alleging that he was unfit parent due to lack of sufficient income, unemployment, unresolved substance abuse issues, emotional stability concerns, and an inability to provide a safe and stable environment for XS. The petition noted, among other concerns, respondent's extensive criminal history and that he had been verbally aggressive with a foster care manager. The trial court authorized the petition on the same day, and in its order appointed an attorney for respondent. There is no indication in the record that respondent requested an attorney, and DHHS indicates that the appointment was "pursuant to Ingham County's internal practices and procedures."

Respondent's attorney appeared at a hearing held on July 27, 2017. Respondent was not personally present, and his attorney noted that he had not had any communication with respondent. The trial court observed that respondent had been personally served with the summons. Respondent's attorney believed respondent had been released from jail, but petitioner noted that new criminal charges had been filed against him. It was unknown whether respondent was back in jail at the time. As the majority notes, respondent refused to provide a telephone number. Respondent also did not appear at a dispositional review hearing held on August 8, 2017, at which the court noted that services were available to respondent but he was not "doing anything."

Respondent's adjudication hearing was scheduled for October 2, 2017. Respondent again did not appear. At the commencement of the hearing, respondent's attorney moved to withdraw from representation. He opined that respondent likely was "aware of these proceedings because he had been in contact with the agency." He further explained that respondent's "number is constantly changed," respondent was not living at the address in the petition, and the caseworker had indicated that respondent "cannot really be contacted." The trial court noted that respondent had actually signed an acknowledgement of service. Respondent's attorney further pointed out that he had no idea what, if anything, respondent wished him to do, which made effective representation impossible. Petitioner expressed the belief that respondent knew that counsel had been appointed. The trial court noted that there was no way to know how respondent wished to pursue the case, if at all. The trial court concluded that "to have [respondent's attorney] represent an empty chair when no one has been in it since he's been appointed I think is unrealistic and quite frankly I believe it puts [him] in a difficult situation." It therefore granted respondent's attorney's motion to withdraw.

The trial court then continued with the adjudication hearing. During the hearing, the caseworker introduced evidence of respondent's extensive history of criminality and drug abuse, as well as respondent's lack of a bond with XS. Indeed, XS did not even know who respondent was at one of her last of six total visits with him.[5] According to the caseworker, despite being offered parenting time three times a week, respondent had only shown up at the agency randomly

---

[5] Respondent would eventually visit XS one more time.

and called "maybe once a month" to get updates about the case. Respondent was homeless, did not have a job, admitted he smoked marijuana after showing up at the agency one day smelling of marijuana, and had an extensive criminal record including substance abuse, domestic violence, larceny, and assault. Furthermore, concern was expressed about his emotional stability. The court ruled that sufficient facts had been presented to establish that respondent's home was currently an unfit place for a child to live based on criminality, and it entered a dispositional order, incorporating petitioner's recommendations.

Respondent eventually made contact with DHHS in mid-September, 2017. He explained that he had been in jail for first degree home invasion from July 23, 2017, until September 12, 2017. He received a copy of the supplementary petition, and he expressed interest in cooperating with DHHS and participating in recommended services. However, he refused to provide a telephone number, and he stated that he did not have a home. After this telephone contact in September 2017, and a visit to the agency on September 25, 2017, to discuss his case, the agency was unable to make contact with respondent until January 16, 2018.

In January 2018, respondent contacted the caseworker by phone and asked to see XS. When asked why respondent had failed to contact her for such a long period of time, he responded that he had gotten "side tracked" but had rehabilitated himself. Respondent met with the caseworker in person on January 22, 2018, although he was late because he forgot that the meeting had been scheduled. The caseworker informed respondent that he was at risk of losing his parental rights due to his extended absence. The caseworker also informed him of all the services that had been ordered by the trial court in October of 2017, and that respondent would be expected to call an hour in advance of any scheduled visits to confirm his attendance. Respondent again declined to provide a telephone number or an address, although he promised to provide that information by telephone later. Respondent then failed to attend a scheduled visitation with XS the next day. Shortly thereafter, in February of 2018, respondent was again incarcerated, having been arrested for burglary and failure to pay child support. When the caseworker visited him in jail, he told her that he had not been in contact with her or with his attorney since his incarceration because he "[did] not like waiting in line for a phone call." On March 8, 2018, petitioner recorded that respondent had only visited XS six times since her birth, and he had not attended any of the parenting classes to which he had been referred.

The trial court held a permanency planning hearing on March 29, 2018. Respondent was present at this hearing and for the first time affirmatively requested an attorney. The trial court promptly appointed a new attorney to represent respondent. The caseworker recommended that the permanency planning goal be changed to adoption due to respondent's lack of involvement in XS's life and his failure to participate in any of the offered services. At the conclusion of the hearing, the court determined that there would be a substantial risk of harm to XS's life, physical health, and mental well-being if she were returned to respondent's care based on his incarceration and lack of participation in services. It ordered petitioner to file a termination petition, and petitioner did so.

A bench trial regarding termination of respondent's rights was held on May 7, 2018. During the trial, evidence was provided that respondent continued to be an unfit parent, because: (1) he had still not found a place to live, (2) he had not attained a form of income to support himself and XS after his disability payments were terminated, (3) he had not shown up to his

-4-

scheduled psychological evaluation, (4) he had not attended the referred parenting classes, (5) had not formed a bond with XS, and (6) he had failed to participate in or benefit from services. Because of the above, and respondent's extensive history of criminality, the trial court found clear and convincing evidence that the statutory grounds for termination were established under MCL 712.19b(3)(c)(i) (conditions that led to the adjudication continue to exist), MCL 712.19b(3)(g) (failure to provide proper care and custody), and MCL 712.19b(3)(j) (reasonable likelihood of harm). It further found that termination was in XS's best interests. Respondent does not challenge the trial court's factual findings that statutory grounds were established or that termination was in XS's best interests. Rather, he argues only that he was denied his right to due process because he was not present when the court adjudicated him or entered dispositional orders, and he was not represented by an attorney during those proceedings.

## II. STANDARD OF REVIEW

"Whether child protective proceedings complied with a parent's right to procedural due process presents a question of constitutional law, which we review de novo." *In re Sanders*, 495 Mich 394, 403-404; 852 NW2d 524 (2014). However, we review unpreserved constitutional issues for plain error affecting substantial rights. See *In re TK*, 306 Mich App 698, 703; 859 NW2d 208 (2014). Under the plain error rule, three requirements must be met: (1) the error must have occurred, (2) the error was plain, i.e., clear or obvious, (3) and the plain error affected substantial rights. *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000).

In *In re Kanjia*, 308 Mich App 660, 663-664, 669-670; 866 NW2d 862 (2014), Our Court explained the termination of parental rights framework and how a respondent-parent can bring a due process challenge to the court's adherence to the framework on direct appeal:

> In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase. Generally, a court determines whether it can take jurisdiction over the child in the first place during the adjudicative phase. Jurisdiction is established pursuant to MCL 712A.2(b). When the petition contains allegations of abuse or neglect against a parent, MCL 712A.2(b)(1), and those allegations are proved by a plea or at the [adjudication] trial, the adjudicated parent is unfit. While the adjudicative phase is only the first step in child protective proceedings, it is of critical importance because the procedures used in adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights.

> Child protective proceedings are initiated by the state's filing a petition in the family division of the circuit court requesting the court to take jurisdiction over a child. A respondent-parent may admit the allegations in the petition, plead no contest to the allegations, or demand a trial. In any event, to take jurisdiction over a child, the trial court must find that the petitioner has proved by a preponderance of the evidence one or more statutory grounds for the taking of jurisdiction alleged in the petition. If the court takes jurisdiction over the child, the proceedings enter the dispositional phase, wherein the trial court has broad authority to effectuate orders aimed at protecting the welfare of the child, including ordering the parent to comply with the [DHHS] case service plan and

ordering the [DHHS] to file a petition for the termination of parental rights if progress is not being made.

Before *Sanders* was decided, under the one-parent doctrine, a trial court was not required to adjudicate more than one parent; instead, a trial court could establish jurisdiction over a minor child by virtue of the adjudication of only one parent, after which it had authority to subject the other, unadjudicated parent to its dispositional authority.

\* \* \*

In *Sanders*, our Supreme Court distinguished between adjudicated and unadjudicated parents; it held that due process requires a specific adjudication of a parent's unfitness before the state can infringe the constitutionally protected parent-child relationship. In other words, the Court in *Sanders* held that due process protections prevent a trial court from entering dispositional orders— including orders of termination—against an unadjudicated respondent. Under this reasoning, a respondent who raises a *Sanders* challenge on direct appeal from a trial court's order of termination is not collaterally attacking the trial court's exercise of jurisdiction, but rather is directly challenging the trial court's decision to terminate the respondent's parental rights without first having afforded the respondent sufficient due process, i.e., an adjudication hearing at which the respondent's fitness as a parent was decided. [*Kanjia*, 308 Mich App at 663-664, 669-670 (internal quotations and citations omitted).]

Additionally, "[c]onstitutional error is either structural and subject to automatic reversal, or it is nonstructural and requires reversal only if [it] was not harmless beyond a reasonable doubt." *People v Toma*, 462 Mich 281, 301 n 15; 613 NW2d 694 (2000). An error of constitutional magnitude places upon the prosecution the burden of establishing that the error was harmless. See *People v Minor*, 213 Mich App 682, 685; 541 NW2d 576 (1995). Nevertheless, a preserved constitutional error is subject to harmless-error analysis unless it constitutes a structural defect. *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999). An unpreserved constitutional error requires a showing of prejudice or that "the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 763-764, 774.

Importantly, the purpose of child protective proceedings is the protection of the children, which is substantially different from the purposes of a criminal proceeding. See *People v Gates*, 434 Mich 146, 161-162; 452 NW2d 627 (1990). Consequently, a parent's due process rights in a child protective proceeding, where the goal is protection of children rather than punishment of their parents, are not necessarily coextensive with the due process rights to which a criminal defendant may be entitled. See *In re Brock*, 442 Mich 101, 107-115; 499 NW2d 752 (1993). Analogizing to criminal cases may be instructive. See *In re Simon*, 171 Mich App 443, 447; 431 NW2d 71 (1988). Ultimately, however, although parents "have an important liberty interest in the management of their children that is protected by due process … the child's welfare is primary in child protective proceedings." *Brock*, 442 Mich at 114-115. "A due-process violation occurs when a state-required breakup of a natural family is founded solely on a 'best

-6-

interests' analysis that is not supported by the requisite proof of parental unfitness." *In re JK*, 468 Mich 202, 210; 661 NW2d 216 (2003).

## III.  DUE PROCESS

Respondent argues, and the majority agrees, that he was deprived of due process because the trial court permitted his first appointed attorney to withdraw from representation at the commencement of the adjudication hearing without prior notice to respondent, and it then proceeded with the hearing despite the absence of both respondent and counsel for respondent. Under the circumstances of this case, I disagree.

As an initial matter, "affirmative action by the [birth parent is necessary] to trigger the appointment and continuation of appointed counsel in all hearings that affect[] the [birth parent's] rights." *In re Hall*, 188 Mich App 217, 218; 469 NW2d 56 (1991). Pursuant to court rule, a respondent has a right to be appointed an attorney upon request, but the trial court is not obligated to appoint counsel *sua sponte* in the absence of such a request. *Id*. at 221-222. In other words, the right to counsel in the instant matter was neither absolute nor self-executing. To its immense credit, Ingham County has a policy of appointing counsel for parents, even where no request was made. However, in the absence of some "affirmative action" by the parent, even if only the bare minimum of merely acknowledging the attorney and acting to convey some approval thereof, the *right* to an appointed attorney was nevertheless not triggered.[6] I therefore respectfully cannot find that respondent's right to an appointed attorney was violated.

Presuming for the sake of argument that respondent *did* have a right to counsel that had attached by the time of the adjudication hearing, as the majority observes, there has been no claim of *structural* error in this matter, nor does the majority find any. Therefore, any error is *necessarily* subject to review for harmlessness.[7] *Toma*, 462 Mich at 301 n 15. Furthermore, even if structural error might have occurred, the deprivation of the right to counsel is not absolutely immune to a harmless-error analysis. *People v Lewis*, 501 Mich 1, 5-12; 903 NW2d

---

[6] I respectfully disagree with the majority that *Hall* is inapplicable. In *Hall*, this Court explained that under former MCR 5.915(B)(1), a respondent in a child protective proceeding did not have a self-executing right to appointed counsel unless that respondent engaged in "affirmative action" to arrange for that appointment. *Hall*, 188 Mich App 221-222. That court rule is in relevant part essentially identical to present MCR 3.915(B)(1), which continues to state that appointment of counsel for a respondent in a child protective proceeding depends, among other things, on the respondent actually *requesting* appointment of an attorney. Respondent's right to appointed counsel is *conditional*, and nothing even close to that requisite condition occurred.

[7] I respectfully disagree with the majority to the extent it suggests the "plain error affecting substantial rights" standard obviates an analysis of harmlessness. My reading of *Carines* is that it deemed a harmless error analysis too simplistic rather than irrelevant, and an inquiry into prejudice seems, functionally, at least very similar to an inquiry into harmlessness. Even in child protective proceedings, errors are necessarily subject to harmless error analysis. See MCR 2.613(A), MCR 3.901(B)(1), MCR 3.902(A).

816 (2017); see also *People v Murphy*, 481 Mich 919, 923; 750 NW2d 582 (MARKMAN, J., concurring), and *Satterwhite v Texas*, 486 US 249, 257-258; 108 S Ct 1792; 100 L Ed 2d 4470 (1988). In *Lewis*, the deprivation of counsel occurred at a preliminary examination, and our Supreme Court concluded that no prejudice could be presumed if the trial itself was otherwise fair. *Lewis*, 501 Mich at 10-11.

I appreciate that the purposes of adjudicative and dispositional phases are distinct, and "possibility of a fix at the back end is not sufficient to justify a lack of process at the front end." *In re Sanders*, 495 Mich 394, 418, 420; 852 NW2d 524 (2014). However, in *Sanders*, the respondent was literally not adjudicated at all. I respectfully disagree with the majority that there is no meaningful distinction between a total deprivation of a procedure and an arguably flawed procedure. I would therefore continue to analogize the situation at bar to the principle that the courts may not simply presume a criminal defendant convicted after an otherwise fair trial to have suffered prejudice, or not to have suffered prejudice, as a result of deprivation of counsel during the preliminary examination. *Lewis*, 501 Mich at 10-11. Thus, I would neither automatically reverse or automatically affirm, but as discussed, examine whether the particular respondent before us suffered actual prejudice under the unique facts of the case. Here, respondent *was* represented by counsel during the dispositional phase of the proceedings, which examined whether any statutory bases for termination actually existed. Furthermore, there is no indication that the proceedings were otherwise mishandled or that the trial court effectively defaulted respondent. At least under the circumstances of this case, I conclude that reversal would only be warranted if respondent was actually prejudiced by his lack of representation at the adjudication.

Respondent and the majority rely on this Court's decision in *In re Collier*, 314 Mich App 558; 887 NW2d 431 (2016). In *Collier*, the petitioner initially filed a petition against the mother of the respondent's child, and it subsequently filed a supplemental petition against the respondent. The mother's attorney advised the trial court that she would be representing the respondent at the adjudication hearing, and the trial court entered an order to that effect. The respondent did not appear at the adjudication hearing, whereupon the attorney advised the trial court that the respondent had not called her despite being given her telephone number. The attorney asked to be dismissed from the case, and the trial court granted that request. The trial court then announced that it would enter a "default," and, after taking testimony, found a basis to take jurisdiction of the child. See *id*. at 561-563.

This Court found that the respondent had been "effectively denied the adjudication to which he was entitled," because the court rules do not permit defaults in child protective proceedings, and a default is intrinsically not an adjudication. *Collier*, 314 Mich App at 569-570. This Court also noted that the respondent was unrepresented despite being entitled to assume that he was being represented, so "even assuming that respondent was not simply defaulted and that an adjudication hearing occurred, we find a violation of due process given that petitioner was permitted to proceed unopposed at the adjudication hearing, thereby effectively depriving respondent of an adjudication." *Id*. at 571-572. Furthermore, there was no indication that the respondent had terminated the attorney-client relationship under the circumstances, and the hearing itself was conducted in a slipshod manner. *Id*. at 572-573. Given the numerous factual differences between *Collier* and the instant matter, I do not believe *Collier* binds us to any conclusion regarding harmlessness here, even presuming the above quotation was not dicta.

The majority also relies on *In re Williams*, 286 Mich App 253, 273-287; 779 NW2d 286 (2009), which I find even more distinguishable because in that case the trial court actively refused to appoint an attorney upon the respondent's request.

Here, respondent made no effort to assert a right to counsel until the March 29, 2018, hearing, at which time the trial court promptly appointed a new attorney. Until that time, respondent did not have a right to representation. Unlike the situation in *Collier* in which the attorney put the onus upon the respondent to contact her, respondent's first appointed attorney here clearly made efforts to contact respondent and was thwarted by behavior respondent continued to display even further into the proceedings. Respondent impliedly argues that his first attorney should have done more to contact him. However, it is always possible to do more, and respondent's argument is somewhat disingenuous given that he did nothing. I find it clear that no attorney-client relationship of *any* kind had *ever* existed between respondent and his first attorney, so no such relationship could be "terminated." I do not dispute the majority's admonition that it would have been the better practice for the trial court to have adjourned the hearing for two weeks and provided notice of appointed counsel's withdrawal due to respondent's noncommunication in the meantime. However, I respectfully disagree with the majority that respondent suffered a deprivation of his rights warranting automatic reversal.

In contrast to the situation in *Collier*, where the trial court proceeded against the respondent in a "perfunctory default" manner, the adjudication hearing here was reasonably conducted. It is undisputed that respondent's lack of participation in XS's life and in the provided services, as well as his extensive history and pattern of criminality, remained unchanged when he was both represented and not represented by counsel. He declined to participate in all services, visited XS only seven times total, and failed to comply with any of the trial court's orders. Furthermore, he continued to be in and out of jail and extremely difficult to contact. Although damaging evidence was admitted against respondent when he lacked the benefit of counsel, the same evidence was presented again later when respondent *was* represented by counsel. See *Hall*, 188 Mich App at 223 ("[w]e fail to see, and respondent has failed to indicate, how she was prejudiced by the absence of counsel at the earlier review hearing, because the testimony … was repeated at the termination hearing.") As was the case in *Hall*, I find the trial court's decision to proceed with the adjudication hearing in the absence of respondent's presence or counsel harmless, if it was even error at all.

Respondent tacitly admits that he failed to comply with his service plan and offers no explanation of how his lack of representation at the adjudication hearing had any effect on the subsequent proceedings, let alone the outcome of the case. Respondent offers no suggestion that the trial court improperly found statutory grounds for termination, nor do I think respondent *could* present any argument to that effect. Respondent does not even present any argument to the effect that termination would not be in the child's best interests. Notwithstanding the importance of parents' due process rights, I cannot agree that any right was violated here, and even if it was, I cannot agree that respondent suffered any actual prejudice as a consequence. Because the purpose of child protective proceedings is the protection of children, I would find it "inconsistent with substantial justice," MCR 2.613(A), to further delay giving the child much-needed stability

and finality for the sake of what plainly appears, under the circumstances of this case, to be a hollow procedural exercise.[8]

## IV. CONCLUSION

I conclude that the trial court's decision to take jurisdiction over the child and enter a dispositional order was not error under the circumstances, and even if it was, any error would be harmless. Requiring attorneys to be appointed to parents who not only fail to seek representation, but who then fail or refuse to communicate with counsel or appear for hearings could lead to parties indefinitely delaying proceedings. The purposes of the child protective services proceedings would not be served by allowing such gamesmanship. Furthermore, an attorney who was unable to contact a client who had never even sought representation could reasonably believe that the representation was undesired and that he or she could not ethically provide representation. Respondent was not deprived of any due process rights to which he was entitled; even if he was deprived of any rights, no structural error warranting automatic reversal occurred; and even if error occurred, it was completely harmless. I would affirm.

/s/ Amy Ronayne Krause

---

[8] Additionally, I note that Ingham County has an exemplary policy of appointing counsel for parents, even where those parents have not yet invoked their right to counsel. It did so in this case and it is just an excellent policy that is not seen consistently across the state.