*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MILLARD/BIRMINGHAM, Minors.

UNPUBLISHED
April 15, 2026
10:34 AM

No. 377030
Lapeer Circuit Court
Family Division
LC No. 23-013076-NA

Before: TREBILCOCK, P.J., and BOONSTRA and LETICA, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating her parental rights to her minor children, HM and MB, under MCL 712A.19b(3)(c)(*i*), (g), and (j).[1] We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In April 2023, the Department of Health and Human Services (DHHS) filed a petition to remove HM and MB from respondents' care. The petition alleged, in pertinent part, that two-month-old MB had broken bones in various stages of healing, which were caused by MB's father; that respondent had a history with Children's Protective Services (CPS); and that she had recently pleaded guilty to fourth-degree child abuse, MCL 750.136b(7), relating to HM. The trial court authorized the petition, and DHHS placed the children with relatives. Respondent was granted supervised parenting time. After respondent pleaded *nolo contendere* to certain allegations, the trial court exercised jurisdiction and ordered her to comply with a case-service plan, which required parenting education and mental health counseling.

During the first review hearing, respondent reported that she had dyslexia. In October 2023, respondent submitted to psychological and psychiatric evaluations, which reflected that she

---

[1] HM's legal father was unknown. MB's father was also a respondent in the proceedings below, and he received full custody of MB after respondent's parental rights were terminated. He is not a party to this appeal.

suffered from mental health issues and a seizure disorder. Respondent was instructed to receive treatment from a neurologist, continue attending therapy, and take prescribed medication. Respondent received accommodations for her dyslexia, and she completed a parenting education course.

Respondent obtained stable housing with her grandmother and provided proof of legal income. Respondent was awarded unsupervised parenting time. But in September 2024, her parenting time was briefly suspended, then reverted to a supervised format because of a maltreatment in care (MIC) investigation arising from allegations that HM was physically abused during an unsupervised parenting time. In April 2025, the trial court ordered DHHS to change the permanency planning goal to adoption and initiate termination proceedings against respondent. In May 2025, DHHS filed a supplemental petition to terminate her parental rights, alleging that she had been dishonest, failed to benefit from services, and failed to rectify the issues that led to adjudication. The petition also noted the results of the MIC investigation and respondent's failure to address her medical conditions, including her seizure disorder.

The termination hearing spanned three dates from June to August 2025. DHHS and respondent's counsel stipulated that DHHS would not present evidence about the MIC investigation except to note that respondent's parenting time reverted to a supervised format during and after the investigation. DHHS caseworkers testified about respondent's lack of progress until the months leading up to the termination hearing. DHHS also presented testimony about HM's behavioral issues, the children's placements during the proceedings, and the children's bonds with respondent. The trial court also discovered that respondent permitted a woman whom she had met on Facebook to move into her grandmother's home in January 2024, but that she did not report this news to DHHS. Respondent permitted the woman to see the children during parenting times even though DHHS had never completed a background check on her. After stating its findings of fact and conclusions of law on the record, the trial court entered the order terminating respondent's parental rights to both children. This appeal followed.

## II. REASONABLE EFFORTS

Respondent argues that DHHS failed to make reasonable efforts toward reunification because respondent was not given accommodations under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*., in relation to her seizure disorder and mental health issues. We disagree.

### A. STANDARD OF REVIEW

"In order to preserve an argument that petitioner failed to provide adequate services, the respondent must object or indicate that the services provided to them were somehow inadequate . . . ." *In re Atchley*, 341 Mich App 332, 336; 990 NW2d 685 (2022) (quotation marks and citation omitted; alteration in original). Respondent did not argue that the initial case-service plan was inadequate. Although respondent's dyslexia was discussed early in the proceedings, the record is clear that she was provided accommodations for that disability. Respondent's mental health issues and seizure disorder were also routinely discussed, but respondent never requested accommodations or assistance related to these issues. Testimony throughout the proceedings focused on respondent's failure to consistently participate in mental-health counseling and

treatment from a neurologist even though respondent asserted that her grandmother provided her with transportation. During closing arguments at the termination hearing, counsel for respondent did not argue that DHHS failed to make reasonable efforts to facilitate reunification. Respondent did not challenge "the adequacy of the services being provided" in relation to her mental health and seizure disorder, so the reasonable-efforts issue is unpreserved. See *id* at 336-337.[2]

In child-protective proceedings, we review unpreserved issues for plain error affecting substantial rights. *In re Pederson*, 331 Mich App 445, 463; 951 NW2d 704 (2020). "To avoid forfeiture under the plain-error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011) (quotation marks and citations omitted). "[A]n error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008). Reversal is only warranted when the plain error "seriously affect[ed] the integrity, fairness, or public reputation of judicial proceedings." *In re Mota*, 334 Mich App 300, 311; 964 NW2d 881 (2020).

B. ANALYSIS

Respondent argues that DHHS did not make reasonable efforts toward reunification because it did not sufficiently accommodate her disabilities. We disagree.

Under the ADA, an individual has a disability if she has or is regarded as having "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 USC 12102(1)(A). Mental health conditions such as attention deficit hyperactivity disorder, anxiety disorders, and bipolar disorder are considered disabilities under the ADA. *In re Matamoros*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 371544); slip op at 5. A disabled individual may not "be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 USC 12132. To accommodate a respondent with a known disability, DHHS "must make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter . . . the service provided." *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017) (quotation marks and citation omitted).

"When challenging the services offered, a respondent must establish that he or she would have fared better if other services has been offered." *In re Sanborn*, 337 Mich App 252, 264; 976 NW2d 44 (2021). The respondent must identify the specific services that the DHHS failed to provide and explain how they would be more appropriate than the services offered. *Id*. at 266-

---

[2] DHHS argues that respondent waived the ADA issue under *In re Terry*, 240 Mich App 14, 26; 610 NW2d 564 (2000), because she failed to raise the issue in the trial court. But after our Supreme Court held in *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017), that reasonable accommodations are a prerequisite to a finding of reasonable efforts, we have reviewed for plain error a respondent's unpreserved argument that DHHS failed to make reasonable efforts at reunification on the basis of its failure to provide reasonable accommodations under the ADA, see, e.g., *In re Sanborn*, 337 Mich App 252, 263; 976 NW2d 44 (2021).

267. A disabled respondent may only raise a direct claim of an ADA violation during the proceedings if she objects to the adequacy of her accommodations before the termination hearing. *In re Terry*, 240 Mich App 14, 26, 26 n 5; 610 NW2d 564 (2000). But ADA compliance is still relevant to the termination proceedings. If DHHS "fail[s] to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA," then it has not provided reasonable efforts toward reunification as is generally required under MCL 712A.19a(2). *In re Hicks/Brown*, 500 Mich at 86.

The respondent is also expected to participate in the services offered:

"While [DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." [*In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).] This means a respondent-parent must both participate in services and "demonstrate that they sufficiently benefited from the services provided." *Id*. [*In re Atchley*, 341 Mich App at 338-339.]

"[A] parent, whether disabled or not, must demonstrate that she can meet [her children's] basic needs before they will be returned to her care. If a parent cannot or will not meet her irreducible minimum parental responsibilities, the needs of the child must prevail over the needs of the parent." *In re Terry*, 240 Mich App at 28 (quotation marks and citation omitted).

Respondent argues that she was not provided with appropriate services to address the barriers to reunification, even though DHHS was aware that she had mental health issues and a seizure disorder.[3] She argues that "DHHS provided no specialized medical coordination, transportation assistance, or scheduling flexibility for neurological appointments," but she does not explain how those accommodations would have improved the outcome of her case in light of her disability, nor does she explain how the services that DHHS offered were deficient. See *In re Sanborn*, 337 Mich App at 267. Regardless, it is clear that DHHS tried to accommodate respondent.

At the first review hearing in September 2023, respondent was ordered to submit to a psychological evaluation after DHHS was informed that respondent had dyslexia. In October 2023, respondent submitted to the evaluation with licensed psychologist Dr. Harold Sommerschield, who noted that the trial court requested a psychological evaluation "to identify any undiagnosed mental health concerns," because "DHHS wants to ensure any other deficits are addressed so [respondent] can reunify with her children." Dr. Sommerschield interviewed respondent, who reported (1) "a history of grand mal and petit mal seizures"; (2) diagnoses of post-traumatic stress disorder and bipolar disorder; and (3) a history of trauma. Respondent was not taking medication for the seizure disorder at the time of the evaluation, but she reportedly took certain psychotropic medications. Respondent stated that she participated in mental health counseling. Dr. Sommerschield recommended that respondent (1) submit to a psychiatric assessment; (2) consider taking medication to address her "significant anxiety"; and (3) continue

---

[3] DHHS does not dispute whether respondent's mental health issues and seizure disorder qualify as disabilities under 42 USC 12102(1).

-4-

attending therapy. Later that month, respondent submitted to a psychiatric evaluation with physician assistant Maggie Ross. Ross recommended that respondent continue taking her current psychotropic medication and begin taking Lamictal, a medication that treats epilepsy and bipolar disorder. Ross also recommended that respondent (1) continue attending therapy; (2) attend medication reviews; and (3) see a neurologist to address her seizure disorder.

Respondent was provided with the necessary referrals. Throughout the remainder of the proceedings, respondent was repeatedly instructed to consult a neurologist, attend therapy, and take prescribed medications to treat her physical and mental health issues. Respondent failed to do so. She attended three medication reviews with Ross, but she stopped attending those appointments after May 2024, so Ross could not refill the psychotropic medications. Nonetheless, respondent continued to see a psychiatrist until July 2025. Respondent testified at a termination hearing in July 2025 that her psychotropic medication changed, and she had to attend to another psychiatric appointment in "a couple of weeks." Respondent testified that her primary care physician prescribed her any necessary medications before she saw the new psychiatrist in July 2025. However, respondent did not provide proof to support this assertion, and the trial court found that respondent's testimony was incredible. During the termination hearing in July 2025, respondent acknowledged that she did not consistently attend counseling until the six months leading up to the hearing. The trial court found respondent's untreated bipolar disorder explained "the ups and downs, the good and bad" that the court observed throughout the case.

Regarding respondent's seizure disorder, respondent testified during the July 2025 termination hearing that she saw a neurologist in May 2025. When asked why she waited until May 2025 to go to the neurologist, respondent reported that she was attempting to schedule appointments, receive necessary referrals, and work with her insurance company. Later, respondent testified that she saw a neurologist sometime in the spring or summer of 2024, but he had "a very bad attitude" and was "very inappropriate." Respondent decided to find a new neurologist, but she acknowledged that she did not explain this situation during previous court hearings. She also did not ask for assistance in this matter. According to the caseworker, respondent repeatedly failed to provide documentation to support that she had obtained any treatment from a neurologist.

Respondent testified she was prescribed Tegretol for seizures and depression, which she took on a daily basis. According to respondent, she was prescribed the medication after she had a seizure and went to the emergency room in May or June 2025. She had not experienced a seizure while taking the medication. Based on a photograph of the prescription pill bottle and respondent's testimony, it was clear to the trial court that respondent did not take the medication as prescribed. The trial court found that respondent "could be driving," employed, and "taking care of" herself if she "took the medications" to address her seizure disorder. The trial court expressed concern about respondent's "lack of follow up."

In summary, respondent merely provides conclusory statements about the services and accommodations she was provided and how they were inappropriate given her alleged disabilities, which is insufficient to establish plain error. See *id*. She did not explain what "specialized medical coordination" she expected to receive beyond the extensive services already offered. Despite the services and accommodations offered to respondent, she lacked commitment and failed to benefit from the services and recommendations offered during the two-year proceedings. Respondent also

alleges that DHHS failed to provide transportation assistance, but she denied at the termination hearing that she had transportation issues during the proceedings. In short, respondent failed to uphold her "commensurate responsibility" to engage in and benefit from the services offered. See *In re Frey*, 297 Mich App at 248. There is no indication that she would have fared better if DHHS had offered other services or accommodations to assist her. See *In re Fried*, 266 Mich App 535, 543; 702 NW2d 192 (2005). Therefore, the trial court did not plainly err by finding respondent was provided with services and accommodations to aid in reunification.

### III. STATUTORY GROUNDS FOR TERMINATION

Respondent next argues that the trial court considered inadmissible evidence when deciding to terminate her parental rights and that no statutory grounds existed to terminate her parental rights. We disagree.

### A. STANDARD OF REVIEW

We review "for clear error the trial court's finding that there are statutory grounds for termination of a respondent's parental rights." *In re Atchley*, 341 Mich App at 343. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Miller*, 347 Mich App 420, 425; 15 NW3d 287 (2023) (quotation marks and citation omitted).

"This Court reviews the trial court's decision to admit or exclude evidence for an abuse of discretion." *In re Archer*, 277 Mich App 71, 77; 744 NW2d 1 (2007). "A trial court abuses its discretion when it chooses an outcome falling outside the range of principled outcomes." *In re Diehl*, 329 Mich App 671, 687; 944 NW2d 180 (2019) (quotation marks and citation omitted). To the extent that an evidentiary question requires an examination of statutes or court rules, this Court's review is de novo. *In re Archer*, 277 Mich App at 77. "Whether child protective proceedings complied with a parent's right to due process presents a question of constitutional law, which we also review de novo." *In re Ferranti*, 504 Mich 1, 14; 934 NW2d 610 (2019).

### B. RULES OF EVIDENCE

"In Michigan, child protective proceedings comprise two phases: the adjudicative phase and the dispositional phase." *In re Pederson*, 331 Mich App at 463 (quotation marks and citation omitted). The rules of evidence apply at adjudication trials. *In re Collier*, 314 Mich App 558, 573; 887 NW2d 431 (2016). Generally, at a termination hearing, "all relevant and material evidence, including oral and written reports, may be received by the court and may be relied upon to the extent of its probative value." MCR 3.977(H)(2). See also *In re Ferranti*, 504 Mich at 16. However, "[i]f . . . termination is sought on the basis of grounds new or different from those that led the court to assert jurisdiction over the children, the grounds for termination must be established by legally admissible evidence." *In re Jenks*, 281 Mich App 514, 516; 760 NW2d 297 (2008), citing MCR 3.977(F)(1)(b).

The trial court exercised jurisdiction because respondent pleaded *nolo contendere* to several allegations, including the following: (1) she pleaded guilty to fourth-degree child abuse in 2023 in relation to her neglect and improper supervision of HM; (2) she had a history with CPS,

which began in 2020; and (3) she "did not stop" MB's father from engaging in "rough play" with MB in 2023, which resulted in broken bones. "[A]ll relevant and material evidence, including oral and written reports," on these issues could be received by the court at the termination hearing and "relied upon to the extent of its probative value." See MCR 3.977(H)(2). During the proceedings, however, new allegations emerged that respondent physically abused HM, which became the subject of the MIC investigation. DHHS included these allegations in the supplemental petition for termination of respondent's rights. Because these allegations were not the basis for the trial court's original assumption of jurisdiction, legally admissible evidence was required to prove them. See MCR 3.977(F)(1)(b); *In re Jenks*, 281 Mich App at 516.

Before the termination hearing, respondent questioned whether DHHS would present legally admissible evidence to support the allegations of physical abuse. At the beginning of the June 2025 termination hearing, counsel for respondent stated that she and counsel for DHHS were "in agreement" that DHHS would "not present any type of evidence or findings with respect to that September 2024 MIC investigation." Counsel for DHHS stated that "the only mention" of the 2024 MIC investigation would be related to respondent's parenting times reverting back to a supervised format during the investigation. Counsel for respondent did not object to that statement. The trial court accepted the stipulation, noting that "any substantiation of a MIC investigation that occurred from a September, 2024 incident will be stricken. We won't get into that."

By entering into the stipulation, respondent waived any argument that the trial court improperly admitted evidence that respondent's unsupervised parenting times reverted back to being supervised after September 2024. See *In re MJC*, 349 Mich App 42, 49; 27 NW3d 122 (2023). "A party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error." *Id*. (quotation marks and citation omitted). See also *Chapdelaine v Sochocki*, 247 Mich App 167, 177; 635 NW2d 339 (2001) ("A party cannot stipulate a matter and then argue on appeal that the resultant action was error."); *In re Archer*, 277 Mich App at 79 n 3 ("A party may not claim error regarding an issue on appeal where the party's lawyer deemed the action proper at trial or otherwise acquiesced."). Therefore, we decline to address this issue because doing so would permit respondent to harbor error as an appellate parachute. See *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011).

To the extent that respondent argues that the trial court admitted evidence that exceeded the stipulation, this argument lacks factual support. The children's lawyer-guardian ad litem (LGAL) stated that he was not a party to the stipulation and "did not agree to anything related to the MIC investigation," but the trial court still ordered the LGAL not to offer any evidence about the details or the results of the investigation. The MIC report itself was not admitted into evidence, and no one at the termination hearing testified about the allegations of abuse that led to the investigation or whether those allegations were substantiated. Consistent with the stipulation, the only evidence that was admitted established that an MIC investigation began in September 2024, and respondent's parenting time became supervised after that time. During closing arguments, respondent's counsel argued, "[T]here has been nothing admitted during trial [sic] that there has been any physical abuse by [respondent] with respect to those two children." The trial court even stated that it could not personally remember the result of the investigation.

Furthermore, respondent does not explain how any of the challenged evidence was inadmissible. She cites no particular rule of evidence, instead arguing that the trial court violated "the spirit of the Michigan Rules of Evidence." Respondent is not entitled to relief on that basis. See *In re Temple Marital Trust*, 278 Mich App 122, 139; 748 NW2d 265 (2008) ("An appellant may not merely announce his or her position and leave it to this Court to discover and rationalize the basis for his or her claims. This failure [to cite supporting authority] constitutes abandonment of the issue.").

## C. DUE PROCESS

Next, respondent argues that her due-process rights were violated because (1) she lacked notice of the evidence against her because she was not given a copy of the "unredacted MIC file," and (2) she was unable to confront and cross-examine witnesses about the results of the investigation because DHHS "tacitly" admitted its results. We disagree.

Due-process rights protect a parent's interest in the care, custody, and management of his or her children. *In re Rood*, 483 Mich 73, 91; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.). "Due process requires fundamental fairness . . . ." *In re Brock*, 442 Mich 101, 111; 499 NW2d 752 (1993) (quotation marks and citation omitted). "The fundamental requisite of due process of law is the opportunity to be heard." *In re Sanborn*, 337 Mich App at 268 (quotation marks and citation omitted). "The opportunity to be heard does not mean a full trial-like proceeding, but it does require a hearing to allow a party the chance to know and respond to the evidence." *Hanlon v Civil Serv Comm*, 253 Mich App 710, 723; 660 NW2d 74 (2002) (quotation marks and citation omitted). A respondent-parent is "afforded the opportunity to present evidence and witnesses at a hearing on the termination of parental rights and to confront and cross-examine evidence and witnesses used against the respondent." See *In re Trejo Minors*, 462 Mich 341, 355; 612 NW2d 407 (2000).

Contrary to respondent's assertions, the record establishes that she was provided a copy of the MIC investigation report and was aware of the related allegations against her. Although counsel complained that she was not in possession of the report at the March 2025 permanency planning hearing, the trial court ordered that respondent be provided an unredacted copy before the next hearing. The trial court stated that it would not rule on DHHS's request to change the permanency planning goal to adoption until respondent had the opportunity to review the report. At the April 2025 permanency planning hearing, counsel for DHHS and the caseworker confirmed that everyone had the MIC report and an accompanying police report. Counsel for respondent did not argue otherwise, and it was clear from her arguments that she reviewed the reports before the hearing. Over respondent's objections, the trial court changed the permanency planning goal to adoption at the April 2025 hearing. Because respondent was in possession of the MIC report well before the termination hearing, this due-process argument fails. As for respondent's argument that she was unable to confront and cross-examine witnesses about the results of the MIC investigation, we reiterate that the results and details of the investigation were never admitted during the termination proceedings, so respondent had no right to cross-examine witnesses on that subject. See MRE 611(c) ("[T]he judge may limit cross-examination regarding matters not testified to on direct examination.").

## D. STATUTORY GROUNDS FOR TERMINATION

"To terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Pederson*, 331 Mich App at 472 (quotation marks and citation omitted). We conclude that termination was proper under MCL 712A.19b(3)(j), which permits termination when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent." The harm contemplated under Subsection (3)(j) includes emotional harm, as well as physical harm. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011). "[A] parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." See *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014).

The children were removed from respondent's care because of allegations of physical neglect. Respondent failed to sufficiently benefit from the parenting services offered to her, and she failed to address her long-standing issues with mental and physical health. Within days of having a seizure in May 2025, respondent operated a riding lawnmower with the children as passengers, despite maintaining throughout the proceedings that she was not allowed to drive a motor vehicle because of her seizure disorder. She testified that the lawnmower ride was "a bonding experience" and denied that the children were in danger. Although she testified that she had not experienced a seizure since being prescribed Tegretol, the trial court found that respondent was not taking her medication as prescribed. Respondent also admitted that she did not consistently attend therapy until six months before the first termination hearing, and she only began taking certain psychotropic medication in July 2025. And the trial court noted that respondent mentioned several other serious health issues throughout the proceedings without evidence to verify her diagnoses or treatment.

Because respondent did not substantially comply with her case service plan in relation to her parenting skills and personal health, there were serious concerns that she would be unable to care for the children's needs, especially given that HM required ongoing therapy, constant supervision to prevent him from hitting MB, and remedial toilet training. Because there was a reasonable likelihood that the children would experience physical, mental, or emotional harm if returned to respondent, the trial court's finding that termination of respondent's parental rights was proper under MCL 712A.19b(3)(j) was not clearly erroneous. Because only one statutory ground for termination must be established by clear and convincing evidence, we do not consider whether the trial court erred by finding that statutory grounds for termination also existed under MCL 712A.19b(3)(g) and (c)(*i*). See *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

## IV. BEST INTERESTS OF THE CHILDREN

Finally, respondent argues that termination was not in the children's best interests. We disagree.

## A. STANDARD OF REVIEW

We review a trial court's best-interest determination for clear error. *In re White*, 303 Mich App at 713. Clear error exists when we are left with a definite and firm conviction that the trial court made a mistake. *In re Miller*, 347 Mich App at 425.

## B. ANALYSIS

"The trial court must order the parent's rights terminated if [DHHS] has established a statutory ground for termination by clear and convincing evidence and it finds from a preponderance of the evidence on the whole record that termination is in the children's best interests." *In re White*, 303 Mich App at 713. "The trial court should weigh all the evidence available to determine the children's best interests." *Id*. When reviewing best interests, the trial court focuses on the child, not the parent. *In re Atchley*, 341 Mich App at 346. This Court has summarized the relevant considerations as follows:

> To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App at 713-714 (quotation marks and citations omitted).]

"[T]he trial court has a duty to decide the best interests of each child individually." *In re Olive/Metts Minors*, 297 Mich App 35, 42; 823 NW2d 144 (2012). "[I]f the best interests of the individual children *significantly* differ, the trial court should address those differences when making its determination of the children's best interests." *In re White*, 303 Mich App at 715.

Regarding HM, there was some evidence that he was bonded with respondent and was excited to spend time with her. HM was also bonded with his foster parents, who were his fictive kin. According to HM's foster mother, HM only "[s]ometimes" mentioned respondent, and he did "[n]ot really" express that he missed her. Respondent's parenting ability was also a subject of concern. She struggled to discipline HM, who often did not listen to her. HM was also aggressive with respondent at times, and he spoke about parenting time in "[b]oth negative and positive" ways. HM, who had behavioral issues and a history of trauma, was "untamable" for 24 hours after parenting times. When respondent's parenting time was suspended, HM's toilet training vastly improved. But after parenting times resumed, HM "reverted back completely." Notably, the trial court found that respondent tried to sabotage HM's placement with his foster parents by falsely accusing them of criminal sexual conduct. Respondent's repeated and unsubstantiated allegations of maltreatment in care against the foster parents jeopardized the stability of HM's foster care placement.

While evidence tended to support that MB was bonded with respondent, the bond was not strong because he was removed from respondent's care when he was only two months old. MB

was strongly bonded with his father and the foster parents, who were also his paternal grandparents and temporarily cared for him during the proceedings. MB did not want to attend parenting times. According to the caseworker, respondent considered releasing her parental rights to MB during the proceedings because she acknowledged that they did "not have a bond." Overall, there was still a dispute about whether respondent "had a healthy bond of any sort with her children." *In re CR*, 250 Mich App 185, 197; 646 NW2d 506 (2002), overruled in part on other grounds by *In re Sanders*, 495 Mich 394, 422-423 (2014). See also *In re Pederson*, 331 Mich App at 477.

The parent-child bond is only one factor for the trial court to consider. See *In re Olive/Metts*, 297 Mich App at 41-42. As already discussed, respondent failed to benefit from the case-service plan. Respondent was either unable, or unwilling, to safely and effectively parent the children despite completing parenting classes and being offered other parenting and mental health services. At the time of termination, respondent had only recently begun taking medication for her seizure disorder. Despite having more than two years to benefit from services, respondent only had supervised parenting time with the children for two hours each week at the time of termination—they were not safe in respondent's care unless a qualified supervisor was present.

Meanwhile, HM was doing well in the care of his foster parents, with whom he lived more than half his life. HM had a healthy bond with the foster parents, who were devoted to HM's well-being and wanted to adopt him. It is unclear how respondent, who did not understand HM's educational or mental health needs, would provide him appropriate care. Importantly, the children required constant supervision because HM was aggressive toward MB. At the time of termination, MB was placed with his father, with whom he was strongly bonded. Although the children would live separately if that arrangement continued, this was in the children's best interests because it ensured MB's safety. It also permitted HM to have more one-on-one time with the foster parents, which is what he craved. The foster parents also intended to ensure that the children continued to spend time together under their supervision. These circumstances weigh in favor of termination. See *id*. at 42.

Importantly, "a child's placement with relatives is a factor that the trial court is required to consider when making its best-interests determination, and a child's placement with relatives weighs against termination." *In re CJM*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367565); slip op at 4 (quotation marks and citation omitted). MB was placed with his father, who is a relative under MCL 712A.13a(1)(j)(*i*); and HM was placed with his foster parents, who are fictive kin under MCL 712A.13a(1)(j)(*ii*). See also *In re CJM*, ___ Mich App at ___; slip op at 5 n 4. After acknowledging the children's relative placements, the trial court nonetheless concluded that termination was proper because it would give the children the permanency, stability, and finality they desperately required. This was not error. A preponderance of the evidence established that termination of respondent's parental rights was in the children's best interests.

## V. CONCLUSION

Respondent has failed to show that DHHS's services failed to accommodate her disabilities, so we conclude that the trial court did not plainly err when it found that DHHS had made reasonable efforts toward reunification. Because respondent was provided with a copy of the MIC report, and because DHHS and the L-GAL did not admit any evidence of the investigation

that respondent did not stipulate to admit, her evidentiary and due-process arguments also fail. The trial court also did not clearly err when it found by clear and convincing evidence that at least one statutory ground for termination existed and found by a preponderance of the evidence that termination was in the children's best interests.

Affirmed.

/s/ Christopher M. Trebilcock
/s/ Mark T. Boonstra
/s/ Anica Letica